UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:06-CV-48-F

| | | |
|---|---|---|
| DANIEL PETERSON, | ) | |
|      Plaintiff and Counter-Defendant, | ) | |
| | ) | |
|   v. | ) | |
| | ) | |
| INTERNATIONAL PAPER COMPANY, et al., | ) | |
|      Defendants. | ) | |
| | ) | |
| INTERNATIONAL PAPER COMPANY LONG | ) | O R D E R |
| TERM DISABILITY PLAN, et al., | ) | |
|      Counter-Plaintiffs. | ) | |
| | ) | |
|   v. | ) | |
| | ) | |
| DANIEL PETERSON, | ) | |
|      Counter-Defendant. | ) | |

Plaintiff Daniel Peterson commenced this action under Section 502(a)(1)(B) of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, seeking

long term disability benefits from his employer's long term disability plan. Peterson initially

filed this action against International Paper Company ("IP"), his employer and sponsor of the

ERISA plan, Wausau Benefits, Inc. ("Wausau"), and Circle Tree Insurance Company. The court

later allowed Peterson to add International Paper Company Long-Term Disability Plan (the

"Plan") and the Plan Administrator of said plan as defendants [DE-39], and the court dismissed

Circle Tree Insurance Company [DE-58] upon a stipulated dismissal [DE-56]. Presently before

the court are cross motions for summary judgment on Plaintiff's ERISA claim [DE-71, 74], and a

motion for summary judgment [DE-73] filed by Peterson on the Defendants' counterclaim for

overpayment of benefits due to Peterson's retroactive Social Security benefits. The motions

have been fully briefed and are ripe for disposition. For the reasons set forth below, the court

finds that the Plan Administrator did not abuse its discretion in denying Peterson's claim for

long-term disability benefits, and the Plan Administrator is entitled to recover overpayments

resulting from Social Security disability benefits paid to Peterson for the period when he was also paid disability benefits by the Plan.

## I. STANDARD OF REVIEW

In the Fourth Circuit, there is a well-established framework for reviewing the denial of benefits under an ERISA plan. Initially, the court must determine de novo whether the Plan document confers discretionary authority on the administrator to make benefits decisions or to construe the terms of the Plan. *Blackshear v. Reliance Std. Life Ins. Co.*, 509 F.3d 634, 638 (4th Cir. 2007). If it does, then the court will review the administrator's decision for abuse of discretion. *See Firestone Tire and Rubber Co. v. Burch*, 489 U.S. 101, 115 (1989). If it does not, then the court must review the benefits decision under a de novo standard. *Id.*

Here, there is no dispute that the Plan confers discretionary authority on the Plan's administrator to make benefits decisions and to construe the terms of the Plan. The Plan states: "The Plan Administrator shall have full power, authority, and discretion to enforce, construe, interpret and administer the Plan." Plan 15, Ex. Page 52, Pl. Mem. Supp. Mot. Summ. Jt. I [DE-84]. As such, the court must determine if the administrator abused its discretion in denying long term benefits to Peterson.

Under this standard, an administrator's decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion independently. *See, e.g., Smith v. Cont'l Cas. Co.*, 369 F.3d 412, 417 (4th Cir. 2004); *Feder v. The Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000). "This is because the plan, in conferring discretion on a trustee with respect to a specific matter, deliberately yields to the trustee's judgment on that matter, as long as it is reasonable." *Colucci v. Agfa Corp.*, 431 F.3d 170, 176 (4th Cir. 2005). "[A] decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Ellis v. Metro., Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997) (quotation omitted); *see also Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787-88 (4th Cir.

2

1995). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion" and "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)), *overruled by implication on other grounds by Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003). A reviewing court must assess the reasonableness of the administrator's decision based on the facts known to the administrator at the time of the decision. *See, e.g., Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608-09 (4th Cir. 1999).

Moreover, should the court determine a Plan fiduciary operated under a conflict of interest, that conflict must be weighed as one factor, among many, in determining whether there is an abuse of discretion. *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2347 (2008) (finding plan administrator operated under a conflict of interest when it served in the dual role of both evaluating claims for benefits and paying the claims); *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 359 (4th Cir. 2008). The Fourth Circuit in *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000), identified eight nonexclusive factors that a court may consider in determining the reasonableness of the discretionary determination:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.* at 342-43 (footnote omitted). The significance of any conflict of interest, or any other factor, will depend upon the circumstances in this case. *Glenn*, 128 S. Ct. at 2351. Where "circumstances suggest a higher likelihood that it affected the benefits decision," such as where

3

there is a history of biased claims administration, a conflict of interest will be an important factor in weighing reasonableness of a decision. *Id.* But any conflict of interest will be less important "where the administrator has taken active steps to reduce potential bias and to promote accuracy," such as by walling off claims administrators from persons interested in finances. *Id.* In sum, this court must review the Plan's determination in this case for abuse of discretion, taking into account any conflict of interest as one of the factors considered in determining reasonableness.

## II. FACTS[1]

### A. **Relevant Plan Terms**

#### 1. **Eligibilty**

The Plan defines the eligibility requirements for receipt of long-term disability benefits. For the first twenty-four months, a claimant is eligible for long-term disability benefits if he is totally disabled from his own occupation, which is defined as being "unable to perform the duties of your job and [being] under the regular care of a licensed physician." Plan 34, Ex. Page 71.[2] After twenty-four months, the standard to obtain long-term disability benefits shifts to an "any occupation" standard. This is defined as being "incapable of performing any occupation or

---

[1] The court draws the facts from the administrative record (AR) that was before Wausau and the Plan Administrator. The parties agree that the AR consists of the following documents: (1) the Plan document, marked Plan 1-43(less preceding zeros); (2) Plan Administrative Services Agreement, stamped D 1-57; (3) IP records, stamped IP 1-473; (4) Wausau records, stamped WB 1-330; and (5) the Wausau-Shaw Management Corporation Agreement for Services, stamped W/S 1-14, as supplemented by discovery responses where relevant. Defendants electronically filed the AR as various exhibits to its summary judgment memorandum [DE-75]. Peterson hard-filed the AR as exhibits bearing consecutively-numbered pages (consisting of a second, distinct page number stamp on each paper) to his memorandum in support of summary judgment [DE-84]. For thoroughness, when citing to the AR, the court will refer to the AR stamp (less any preceding zeros) *and* Peterson's exhibits' numerical stamp.

[2] The specific eligibility requirements for long-term disability benefits are set out in a booklet that is the Summary Plan Description. This SPD is incorporated by reference in the Plan document. Plan at 10 & 28, Ex. Pages 47 & 65.

4

employment for which [the claimant] is qualified by education, training, or experience." *Id.*
The Plan designates the administrator as IP's Senior Vice President for Human Resources. Plan
38, Ex. Page 75.

IP pays insurance premiums to Circle Tree Insurance. Circle Tree covers the costs of
benefits paid under the Plan. Moreover, the Plan notes that benefits "are administered by the
Wausau Insurance Companies." *Id.* Further, the Plan notes: "Wausau reviews claims for
benefits and authorizes payment in accordance with the terms of the [Plan]." *Id.*

Long-term disability benefits under the Plan are sixty percent of monthly salary, or sixty-
six and two-thirds percent if a claimant is "eligible for family benefits from Social Security." *Id.*
at Plan 43, Ex. Page 80.

### 2. Other Sources of Disability Income

The Plan further provides: "If the Covered Employee is eligible to receive other sources
of disability income, those sources will reduce long-term disability benefits payable under the
Plan." Plan 10, Ex. Page 47. The Plan notes other sources of disability income includes Social
Security disability benefits. *Id.* The Plan further states:

> If disability payments from other sources are delayed and paid to the Covered
> Employee retroactively in a lump-sum amount, the Covered Employee will be
> required to reimburse the Plan for the amount of any excess long-term disability
> benefits such Covered Employee may have received.

*Id.* at Plan 11, Ex. Page 48. Additionally, the Plan states:

> In the event a payment or the amount of a payment is made erroneously to an
> individual, the Plan shall have the right to reduce future payments to or on behalf
> of such individual by the amount of the erroneous or excess payment. This right
> to offset shall not limit the right of the Plan to recover an erroneous payment in
> any other manner.

*Id.* at Plan 21, Ex. Page 58. Likewise, the Plan says:

> Right to Recover Payments
> Whenever a payment has been made by the Plan, including erroneous payments,
> in a total amount in excess of the amount payable under the Plan, irrespective of

5

to whom paid, the Plan shall have the right to recover such payments, to the extent of the excess, from the person to or for whom the payment was made.

*Id.* at Plan 22, Ex. Page 59.

## B. Wausau's Duties with Regards to the Plan

Under an Administrative Services Agreement with IP, Wausau had certain duties and responsibilities to administer the claims of salaried employees of IP. *See* D 1-57, Ex. Pages 82-138. Section 5, "Claims Services," of the Administrative Services Agreement, states in part:

> During the course of this Agreement, WAUSAU shall review initial Claims, determine the amount of Benefits, if any, to which a Participant is entitled, under the terms of the Plan, and arrange prompt payment of any Benefits. Payments shall be made by WAUSAU with the Plan Sponsor's funds on behalf of the Plan Sponsor in accordance with the terms of this Agreement and Plan. Review of any disputed claims, and decisions on the disposition of any such claims, shall be the responsibility of the Plan Sponsor.

D 6, Ex. Page 87. Wausau also agreed to provide "clerical services with respect to the Plan's subrogation provisions," including notifying claimants of Plan subrogation provisions and requesting payment under the same. *Id.* Further, an amendment to the Agreement (effective January 1, 2002) specifies:

> Wausau Benefits provides the following Long Term Disability services:
> ...
> * Refers the case to an Independent Review, or to an Independent Medical Exam or to Functional Capacity Exam, if the Case Manager is unable to determine the person's total disability status;
> ....
> * Coordinates with the subrogation unit;
> ...
> * Provide Social Security Approval Assistance (Social Security Disability Income)

*Id.* at D 52, Ex. Page 133. Wausau was paid through a fee schedule, generally based on per employee per month ("PEPM") fees. *See id.* at D 54, Ex. Page 135 (2001 "Schedule A: Fee Structure") and D 56-57, Ex. Page 137-38 (2001 "Schedule B: Fee Structure"). The court also notes that the Fee Structure, Schedule A Exhibit to the Administrative Services Agreement lists,

6

*inter alia,* the "item" "Subrogation Servicing Internal Administration" and the corresponding

"fee" as "25% of Recoveries."

Under the Administrative Services Agreement, Wausau was understood to be an

independent contractor, and Wausau was not to be liable "for payment of [b]enefits under the

Plan." *Id.* at D 9-10, Ex. Page 90-91. The Agreement also states:

> It is understood and agreed that WAUSAU is not a fiduciary with respect to the
> Plan, as defined under [ERISA], and that WAUSAU is retained under this
> Agreement to perform ministerial functions, not discretionary functions as
> clarified in Department of Labor regulations under ERISA at 29 C.F.R. § 2509.75-
> 8, D-2.

*Id.* at D 9, Ex. Page 90.

## C. Claims Handling and Medical Evidence

Daniel Peterson worked for IP from 1975 until he was removed from work on November

7, 2001, upon the advice of his psychiatrist, Dr. Paul A. Buongiorno. In 2001, Peterson held the

position of maintenance supervisor and earned an annual salary of $70,861. IP 472, Ex. Page

205. Peterson had suffered from anxiety and depression since 1999, when IP's Employee

Assistance Program referred him for treatment to Dr. Buongiorno. In an October 25, 2001, visit

to Dr. Buongiorno, Peterson reported that he would "go postal" under the stress he felt at work.

IP 354, Ex. Page 271. Dr. Buongiorno noted he had "totally decompensated over the stress at

work." *Id.* The situation came to a head on November 7, 2001, when Dr. Buongiorno's notes

state:

> Met with [Peterson] on an urgent basis today. He decompensated at work
> yesterday. ... [H]e had to leave work. ... Shaky, tremulous today. This is despite
> [medications]. Feels guilty about living [sic] work but his emotional health is
> failing. ... Not sleeping at night. ... Will start disability paperwork.

*Id.* Peterson received salary continuance from his short term disability policy with IP through

April 30, 2002.

7

### 1. **Application**

Peterson submitted his claim for long-term disability benefits under the IP Plan to Wausau on March 19, 2002. IP 471-72, Ex. Page 204-05. At the time he applied for benefits, Peterson and his wife signed a "Long-Term Disability Payment Options" form, which states that the Plan's long term disability benefits will be reduced by actual or estimated Social Security benefits "which you or your spouse and family are eligible to receive," whether or not the claimant applies for them. IP 469, Ex. Page 202. Peterson checked the second option on the form, which indicated he chose to be paid a monthly benefit with no reduction for estimated Social Security benefits. The form states, "[t]his may result in an overpayment by us," and "[y]ou must . . . repay any overpayment." *Id.* It further states that if he receives Social Security benefits, his monthly Plan benefits will be reduced by the amount of Social Security benefits "you and your spouse and family receive." *Id.*

Also when applying for benefits, Peterson signed a form titled "Agreement to Reimburse in the Event of Lump-Sum Social Security Payment," which states in part:

> In accordance with [the Plan], I, the undersigned, hereby agree that if I should receive a retroactive lump-sum Social Security payment for a period during which I have received the weekly benefit payable under the Plan, I will reimburse the company an amount equal to the amount by which the monthly benefit would have been reduced had the Social Security payment been paid on a periodic, rather than a lump-sum, basis.

IP 468, Ex. Page 201.

Along with his claim form, Peterson also submitted toWausau an attending physician's statement completed by Dr. Buongiorno. Dr. Buongiorno indicated Peterson was totally disabled from his own job and any job, and his diagnosis was "major depression, severe, recurrent, with agitation, suicidal features." IP 463, Ex. Page 207. Dr. Buongiorno noted Peterson could not work because his "symptoms [are] ongoing, daily, [and he is] unable to focus, concentrate, suicidal." Peterson also applied for Social Security disability benefits on April 1, 2002.

8

Wausau approved Peterson for long-term disability benefits effective May 1, 2002, in the amount of $3,543.05 per month, which represented sixty percent of his monthly salary. IP 445, Ex. Page 220. This initial approval of benefits was made by employees within Wausau; the approval was communicated to IP via e-mail from a Wausau claims representative. IP 7 & 444, Ex. Pages 218 & 442.

### 2. **Twenty-Four Months of "Own Occupation" Disability Benefits**

Peterson received long-term benefits in the "own occupation" phase of his disability claim from May 1, 2002 through May 31, 2004. During that time, he continued seeing Dr. Buongiorno at least monthly for treatment and reassessment and adjustment of medications to try to get some improvement. Dr. Buongiorno's notes from his sessions with Peterson in 2002 through early 2004 reflect Peterson's frustration with not being able to work at IP, not knowing which career redirection to pursue and not having the drive or energy to do so, being so tired, and overall not getting well. *See* IP 354-62, Ex. Pages 271-79.

On November 6, 2002, Wausau sent Peterson a letter indicating that, "[a]s a service to you," Wausau would make available, at no cost, The Shaw Group ("Shaw") to represent him in his claim for Social Security disability benefits. IP 438, Ex. Page 223-24. Peterson accepted this offer by returning the included medical release form. Wausau and Shaw had a contractual agreement by which Wausau paid Shaw a fee for developing claimant's Social Security cases and representing them in such cases *See* W/S 3, Ex. Page 142. Wausau also agreed to make available to Shaw "relevant documents and information" in order to pursue the Social Security claims, and Wausau reimbursed Shaw for the costs of securing assessments and medical reviews not available in the Wausau file but necessary for pursuing Social Security claims. *See* W/S 4-5, Ex. Pages 143-44. Throughout Shaw's representation of Peterson, Shaw kept Wausau informed of the process (mostly through e-mail), but Shaw only communicated with Peterson twice—on the phone and again at the actual Social Security hearing. Peterson Aff., ¶ 3, Ex. Page 155.

9

On February 13, 2003, apparently at the request of Shaw, Dr. Buongiorno completed a

Mental Residual Functional Capacity Assessment of Peterson ("2003 RFC"). IP 244-46, Ex.

Page 332-34. In it, Dr. Buongiorno indicated Peterson had poor ability across the board in

activities related to sustained concentration and persistence, poor abilities in most social

interaction areas, and poor or no abilities in most adaptation areas, and fair abilities in areas of

understanding and memory. *Id.* Shaw must have eventually submitted this report with

Peterson's Social Security claim, because the Administrative Law Judge's opinion summarized

it. IP 252-53, Ex. Page 340-41.

On March 26, 2003, Dr. Buongiorno completed for *Wausau*–not Shaw– a "Behavioral

Health Attending Physician Statement/Disability," in which he indicated the medications

Peterson was taking, that he met monthly with Peterson, and that Peterson was still totally

disabled from any job. IP 416-17, Ex. Page 269-70. Apparently, this was a medical update to

ensure Peterson was still eligible for benefits in this initial "own occupation" phase of disability.

Peterson underwent a shoulder surgery in late 2003, and Dr. Buongiorno's exam notes

from January 13, 2004 indicate that such surgery caused Peterson to have more tremors and to

be more depressed, and that he had suffered a blow to his self-esteem by not being able to

complete a real estate appraiser's course. IP 362, Ex. Page 279.

### 3. Center Report Obtained by Wausau: Denial of "Any Occupation" Benefits

On February 4, 2004, Wausau notified Peterson that he would enter the "any

occupation" phase of his claim on May 1, 2004, and his claim would be reviewed to determine

eligibility under this new standard. As part of this review, Wausau hired an independent

psychiatrist, Dr. Barbara Center, to review Peterson's claims file. Dr. Center issued her report

on April 9, 2004, in which she opined that Peterson was not totally disabled.

Specifically, Dr. Center's two-page report briefly reviewed Peterson's treatment with Dr.

Buongiorno, and her findings state, *inter alia*:

10

1. The patient has been diagnosed with Major Depressive Disorder, Recurrent Severe. In the opinion of this reviewer, this diagnosis has been appropriate in the past but no longer appears to be clearly substantiated based on the available symptoms. A diagnosis of Depressive Disorder, in Partial Remission appears most appropriate.
2. In the opinion of this reviewer, the patient does not manifest significant measurable impairments which would prevent him from performing any occupation or employment.
...
3. In the opinion of this reviewer, the patient is not totally disabled from any occupation. The patient could return to work at this time.

*Id.* at IP 345, Ex. Page 294.

Wausau notified Peterson by letter dated April 26, 2004 that he was not eligible for benefits under the "any occupation" standard in light of the opinion of an independent reviewer (Dr. Center) that he is not totally disabled and could return to work without restrictions. IP 341-42, Ex. Page 302. Peterson's Plan benefits were terminated as of June 1, 2004.[3] *Id.*

Although it appears (from the facsimile stamp) that Wausau received Dr. Center's report on April 12, 2004, there is no evidence that Wausau ever forwarded the report to Shaw or that Shaw ever possessed the report. *See* Def. Mem. Opp. Summ. Jt. at pp.12-13 (discussing same) [DE-88]. Wausau should have been aware that Peterson's Social Security hearing was scheduled soon. In fact, the Social Security hearing took place on May 5, 2004, a little over a week after Wausau had denied Peterson benefits under the Plan.

### 4. Successful Social Security Claim—Shaw Represents Peterson

At almost exactly the same time that Wausau obtained a review opining Peterson *could* return to work, Shaw had Dr. Buongiorno complete a "Mental Impairment Questionnaire (RFC

---

[3] It appears to the court that Peterson actually received twenty-*five* months, rather than the Plan-specified twenty-four months, of "own occupation" disability coverage from May 1, 2002 to May 31, 2004. Perhaps this was an inadvertent error by Wausau, or perhaps the period was extended because the denial letter was mailed so late in the twenty-fourth month (April) of Peterson's receipt of long-term disability benefits.

& Listings)" (dated April 18, 2004) in order to support Peterson's case for *total disability* at the Social Security hearing. IP 238-43, Ex. Pages 326-331 ("2004 RFC").

This 2004 RFC by Dr. Buongiorno noted Peterson had "failed numerous medication trials," and was "chronically depressed." Dr. Buongiorno opined Peterson had poor or no useful mental abilities in many areas needed to do both semi-skilled and unskilled work. He noted Peterson "decompensates in unfamiliar situations," and had frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks, and repeated episodes of deterioration or decompensation in work settings. IP 242, Ex. Page 330. The Social Security Administrative Law Judge ("ALJ") discussed Dr. Buongiorno's 2004 RFC in detail in his opinion. IP 253, Ex. Page 341. However, Wausau did not mention Dr. Buongiorno's latest report in its denial letter to Peterson, sent just eight days after Dr. Buongiorno prepared the 2004 RFC.

On May 5, 2004, Peterson testified before ALJ Francis Talbot in support of his Social Security disability claim. On June 8, 2004, the ALJ issued a "fully favorable decision" which found Peterson to be completely disabled due to major depression and a panic disorder, along with tremors. The ALJ found Peterson's assertions that he was unable to work to be credible. IP 255, Ex. Page 343. The ALJ discussed a "State agency" psychiatrist's mental RFC assessment from September 2002, which seemed to indicate Peterson could return to work. However, that assessment is not in the Administrative Record relative to this ERISA claim. The ALJ gave greater weight to Dr. Buongiorno's opinion regarding disability than to the "State Agency's" opinion. IP 254, Ex. Page 342. The standard under which the ALJ found Peterson disabled was:

> [T]he inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

IP 250, Ex. Page 338.

Peterson was awarded retroactive Social Security disability benefits beginning May 2002. IP 256, Ex. Page 344. This is the same date that his Plan long-term disability benefits began. On or about July, 2004, Peterson received a net amount of $45,757 for retroactive Social Security benefits from May 2002 through June 2004. IP 295-96, Ex. Page 262-63. The court notes that this retroactive payment overlapped with the twenty-five months in which Peterson was paid Plan benefits, plus one extra month—June 2004—after Plan benefits were cut off. Thereafter, Peterson received monthly Social Security benefits in the amount of $1,735 (net), to be adjusted for cost-of-living. *Id.* He also became entitled to Medicare insurance. Sometime thereafter in 2004, Mr. Peterson's wife, Sheryl Peterson, filed for Social Security disability dependents' benefits on behalf of the couple's four minor children. The Social Security Administration awarded these dependents' benefits, payable to Sheryl, for the four children. D. Peterson Aff., Ex. Pages 155-56.

From August 2004, to October 2004, Wausau sent Peterson four letters demanding repayment from Peterson for the "overpayment" resulting from his long-term disability benefits being paid without a reduction for Social Security benefits. IP 287-290, Ex. Page 311-14 (Aug. 19, 2004, letter); IP 286, Ex. Page 310 (Sept. 14, 2004, letter); IP 276-77, Ex. Pages 307-08 (Sept. 15, 2004, letter); IP 283, Ex. Page 309 (Oct. 15, 2004, letter). Initially, Wausau demanded $43,366.89 in repayment, but it adjusted that demand to $55,183.87 to account for dependent's Social Security benefits also received by the family retroactively.

### 5. **First Appeal: Mosbach Report**

On October 20, 2004, Peterson, by counsel, appealed the denial of benefits and submitted, *inter alia,* the 2003 and 2004 RFC's from Dr. Buongiorno, a vocational assessment by Patrick Clifford, a neuropsychological report from Dr. Jones, Dr. Buongiorno's response to Dr. Center's report, correspondence indicating Dr. Buongiorno's and Dr. Jones' agreement with the vocational assessment, Dr. Snyder's and Physician Assistant Pepper's (Peterson's treating

13

providers) notes indicating agreement that Peterson was totally disabled, and the Social Security decision. IP 233-73, Ex. Pages 321-61.

Dr. Buongiorno's letter, dated September 27, 2004, discussed the import of Dr. Jones' neuropsychological testing, discussed his unsuccessful treatment of Peterson and reiterated that Peterson could not return to "any form of competitive employment" and had a poor prognosis. IP 262-63, Ex. Pages 350-51. He stated his clinical impression of Peterson was totally supported by the testing and recommendations of Dr. Jones. *Id.*

Dr. Christy L. Jones, a neuropsychologist, met with Peterson some four times in September 2004, to administer neuropsychological tests, on a referral from Dr. Buongiorno. IP 257-61, Ex. Pages 345-349. She noted Peterson's history and reported symptoms. She also noted Peterson's IQ Index scores fell within the average range, with the exception of his processing speed index, which fell below ninety percent of the population, which suggested "either psychiatric factors or subcortical involvement." IP 259, Ex. Page 347. Dr. Jones reviewed the mostly average test results, which she indicated would be expected. She also noted "[r]esults suggest no evidence of malingering." IP 260, Ex. Page 348. However, she noted that "[a]nalysis of the clinical scales from the MMPI-2 suggest an elevated number of relatively rare responses," and "analysis of the content scales highlights severe depression, at least moderate anxiety, and negative treatment indicator as well as at least moderate work-related stress" *Id.* She continued: "Taken together, results suggest severe psychopathology that is chronic in nature and at a level that is debilitating." *Id.* Dr. Jones concluded:

> Mr. Peterson appears to be demonstrating a pseudodementia that is significantly impacting other domains of neurocognition which would likely improve with some improvement in depression.
> ...
> At this point in time, it is my professional opinion that Mr. Peterson is unable to return to work.

14

IP 261, Ex. Page 349. Pseudomentia is "[a] severe form of depression resulting from a progressive brain disorder in which cognitive changes mimic those of dementia." IP 60, Ex. Page 363.

On October 14, 2004, Patrick Clifford, a certified vocational evaluator, performed a vocational assessment on Peterson. IP 266–70, Ex. Pages 354-58. Clifford reviewed Peterson's medical records, analyzed Peterson's job description, reviewed the Plan language, and interviewed Peterson. Clifford concluded that Peterson "is in fact permanently and totally disabled from performing the essential material job tasks of his past occupation and that he is incapable of light alternative employment in the national economy." IP 270, Ex. Page 358. Clifford also opined that "Peterson would not benefit from vocational retraining." *Id.* Drs. Jones and Buongiorno made notations on a letter from Peterson's counsel that they agreed with the vocational assessment. IP 271-72, Ex. Pages 359-60. Dr. Frank Snyder and Physician Assistant Jeremy Pepper, who treated Peterson, also indicated on a letter that Peterson could not return to full time competitive employment. IP 273, Ex. Page 361.

Wausau extended the time period for the appeal an additional 45 days, to which Peterson's counsel consented. IP 229, 230. Wausau then sought another opinion from an independent medical reviewer. On December 16, 2004, Peter Mosbach, Ph.D, who is board-certified in allied health and clinical psychology, issued a report after reviewing Peterson's file. IP 217-24, Ex. Pages 368-745. Dr. Mosbach did not agree with Dr. Jones' interpretation of the neuropsychological test results–specifically he disagreed Peterson had pseudodementia–because Peterson's "scores were all within the normal range of functioning in regards to memory and basic intellectual functioning." IP 218, 222, Ex. Pages 369, 373. Mosbach also noted he did not agree with Clifford's vocational assessment, noting Clifford's report was "almost entirely a summary of previous reports," merely adopts others' opinions, and does not

provide a rationale or point to specific evidence for his opinion. IP 218 & 222, Ex. Pages 369 &373. Dr. Mosbach opined:

> I do not believe that the claimant is totally disabled and incapable of performing "any" occupation or employment for which he is qualified by education, training or experience from 06/01/2004. His responses to the neuropsychological evaluation were basically normal. I found no objective evidence in the supplied records that he is disabled from any occupation.

IP 218, Ex. Page 369.

On December 14, 2004, Dr. Buongiorno noted by letter to Peterson's counsel that Dr. Mosbach's phone call to him about the case lasted mere minutes, and he only confirmed that Peterson was totally disabled and had not improved after treatment over years. IP 226, Ex. Page 378. Peterson's counsel forwarded this letter in support of the appeal to Wausau on December 20, 2004. IP 225, Ex. Page 377. Peterson's counsel's letter to Wausau also took issue with Dr. Mosbach's inability to consult with Dr. Jones due to failing to provide Dr. Jones a Health Insurance Portability and Accountability Act ("HIPAA") release. Without the release, Dr. Jones would not speak with Dr. Mosbach about Peterson. *Id.*

On February 2, 2005, Wausau upheld the denial of Peterson's claim on the basis of Dr. Mosbach's opinion. IP 213-15, Ex. Pages 380-82. The letter noted Wausau had complied with regulations (presumably ERISA regulations) requiring a "fiduciary" adjudicating adverse claims decisions to consult with a health care professional, and had conduced a full and fair review. IP 214, Ex. Page 381. The letter informed Peterson of his right to appeal to the "Plan Administrator" for "IP Employee Benefits." *Id.*

### 6. Second Appeal: Axelrod Report

Peterson's counsel made a second appeal on February 25, 2005, to the Plan Administrator of IP Employee Benefits. IP 64-68, Ex. Pages 386-90. This review would be the final decision in Peterson's case. Peterson's counsel submitted, *inter alia*, a February 14, 2005, letter from Dr. Buongiorno restating his opinion that Peterson was totally and permanently

16

disabled, a February 24, 2005, letter from Dr. Jones challenging the findings of Dr. Mosbach, and the CV's for both doctors.

Dr. Buongiorno's February 14, 2005, letter summarized his treatment of Peterson, and noted Peterson had failed in his attempts to study heating and air conditioning repair and real estate appraisal because of his depression and anxiety. IP 130-31, Ex. Pages 391-92. The letter also noted Peterson has tried and failed a number of medications, and has reached maximum medical benefit. He opined again that Peterson "remains totally and permanently disabled." IP 131, Ex. Page 392. Dr. Buongiorno's curriculum vitae was twenty-five pages long. IP 132-57, Ex. Pages 393-418.

Dr. Jones' February 24, 2005, letter was a direct, highly detailed and analytical response to Dr. Mosbach's report. IP 159-60, Ex. Pages 420-21. She noted, "Mr. Peterson's degree/level of psychiatric distress, not his pseudodementia, is the root of his problem and the cause of his inability to maintain gainful employment." IP 159, Ex. Page 420. She explained why Peterson's pattern of results and style of response were consistent with pseudodementia. She explained that Dr. Mosbach erred in concluding that results in the mostly normal range indicated no pseudodementia. Dr. Jones noted Peterson's markedly low processing speed index and other related scores, when seen in a pattern of otherwise normal results, along with his style of response, indicate a pseudomentia. Dr. Jones noted she has taught classes on depression and dementia. Dr. Jones concluded, regardless whether Peterson has a pseudodementia, "his general level of psychiatric distress and personality profile should qualify him for Disability." IP 160, Ex. Page 421.

Although this final appeal was sent to IP, a Wausau employee, Colleen Bukowski, initially reviewed it. *See* IP 51, Ex. Page 430 (e-mail communications). Bukowski indicated to an IP benefits analyst that the rebuttal opinions from the "psychologist" [Dr. Jones] "need to be addressed by another psychologist" by an independent review. *Id.* She had a name of a "highly

17

credentialed reviewer." She suggested they wait for that psychologist's review, and if "further review is requested" they could obtain another review by a psychiatrist. William Webb, benefits analyst at IP, agreed, and indicated their reviewer should discuss the case Dr. Jones. *Id.*

Wausau benefits thus obtained another independent review from Bradley Axelrod, Ph.D., a neuropsychologist. IP 16-22, Ex. Pages 434-438B. In Dr. Axelrod's report, dated April 4, 2005, he agreed (after speaking with her) with Dr. Jones' findings that Peterson had chronic depression. IP 18, Ex. Page 436. Dr. Axelrod also spoke with Dr. Buongiorno, and he noted that Dr. Buongiorno indicated that medications were effective in treating Peterson from 1999 through 2001, but since then, medications have only been mildly effective, and depression and anxiety persist. IP 19-20, Ex. Pages 437-38. Dr. Axelrod noted that Dr. Buongiorno told him Mrs. Peterson had returned to work while Mr. Peterson was at home, trying to handle the domestic responsibilities of the family. Dr. Axelrod concluded:

> Based on my review of these reports and the neuropsychological summary data, Mr. Peterson does not appear to have any cognitive deficits, aside from mild and intermittent self-reported concentration difficulties. His primary difficulty falls within the affective domain. He carries a diagnosis of Major Depression that is recurrent. Treatment appears to have been primarily pharmacologic, with some transient benefit.

> Despite the ongoing presence of his Major Depressive Disorder symptoms, Mr. Peterson should not be restricted from all employment opportunities and therefore, would not be considered "totally disabled" based on the plan language provided. In fact, work might assist in improving his overall self-esteem and help fight possible feelings of hopelessness. He clearly has the cognitive ability to work in some capacity. Moreover, if placed in a non-supervisor position, he might be even more receptive to a return to work and less reactive to purported work-related stressors. At present, though, he should be considered partially impaired by his Major Depressive Disorder, Recurrent, although not to the level of "totally disabled" so outlined by the plan language provided.

IP 20-21, Ex. Pages 438-438A.

Upon receipt of Dr. Axelrod's report, both the IP employee and the Wausau employee agreed that no further review by a psychiatrist or other professional would be necessary. IP 11, Ex. Page 440. Thus, the claims file being considered complete, a "group in the Office of the Plan

18

Administrator to which the Plan Administrator had delegated responsibility for making final claim decisions met to consider Mr. Peterson's claim." Hartfiel Aff. ¶ 48 [DE-76]. The group upheld the denial of benefits to Peterson. Melissa Hartfiel, Benefits Consultant for IP, sent the final denial letter on April 25, 2005. IP 7-10, Ex. Pages 442-45. The letter notified Peterson that he did not meet the definition of "totally disabled" from "any occupation" under the Plan. The letter stated that the "plan administrator agrees with Wausau Benefits' determination." IP 9, Ex. Page 444.

## III. ANALYSIS

The court will first address a matter raised in Defendants' summary judgment motion: whether Wausau is a proper party to this ERISA action. Next, the court will apply the abuse of discretion standard of review to determine whether the Plan Administrator abused its discretion in determining Mr. Peterson was not eligible for long-term disability benefits under the Plan's "any occupation" provisions. Finally, the court will address the Defendants' counterclaim regarding recovery of overpayments due to retroactive Social Security benefits awarded to Mr. Peterson and his family for time periods in which he had received Plan disability benefits.

### A. **Wausau as a Party under ERISA**

The facts indicate that Wausau handled the claim, exclusively, and made two denial determinations, until a final review was had before a "group" of IP employees. This group, which was delegated by the Plan Administrator to make final benefits determinations, met, reviewed Peterson's claims file (developed by Wausau), and upheld the denial of benefits. The contract documents between Wausau and IP indicate that Wausau handles claims, and Wausau is understood to *not* be a fiduciary under the Plan. As noted in the factual section, Wausau's agreement with IP provides:

> It is understood and agreed that WAUSAU is not a fiduciary with respect to the Plan, as defined under [ERISA], and that WAUSAU is retained under this Agreement to perform ministerial, not discretionary functions as

19

clarified in Department of Labor regulations under ERISA at 29 C.F.R. §
2509.75-8, D-2.

D 9, Ex. Page 90.

Peterson brings his action for benefits under 29 U.S.C. § 1132 of ERISA, and he seems to

argue that Wausau is a proper party because it acted as a fiduciary under the Plan. The court

notes that 29 U.S.C. § 1132 (ERISA) specifies who may be sued and subject to a money

judgment:

> (1) An *employee benefit plan* may sue or be sued under this subchapter as an
> entity. . . .
> (2) Any money judgment under this subchapter against an employee benefit plan
> shall be enforceable only against the plan as an entity and shall not be
> enforceable against any other person *unless liability against such person is
> established in his individual capacity under this subchapter.*

29 U.S.C. § 1132(d) (emphasis added). Obviously, Wausau is not the employee benefit plan

"entity" under Section 1132(d)(1).

It appears Peterson argues that Wausau is a proper party under 29 U.S.C. § 1132(d)(2),

because any money judgment he may obtain would be enforceable against Wausau due to

Wausau being independently liable for breach of fiduciary duty. Without deciding here if

Wausau is, indeed, a Plan fiduciary under ERISA, the court notes that fiduciaries of ERISA

plans have been subject to suit under the so-called "catch-all" provision of ERISA, Section

502(a)(3). This catch-all remedial provision states:

> A civil action may be brought by a participant, beneficiary, or fiduciary (A) to
> enjoin any act or practice which violates any provision of this title or the terms of
> the plan, or (B) to obtain *other appropriate equitable relief* (i) to redress such
> violations or (ii) to enforce any provisions of this title or the terms of the plan.

29 U.S.C. § 1132(a)(3) (emphasis added).

The Supreme Court has discussed the circumstances under which this "catch-all"

provision may be invoked. In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), ERISA plan

beneficiaries sued their employer, as a plan fiduciary, under this catch-all provision, for

20

misrepresentations made to them regarding the security of their benefits if they transferred benefit plans. The Supreme Court discussed whether such lawsuit for individual relief was authorized under the catch-all provision, noting:

> [W]e should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury [under ERISA], there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate."

516 U.S. at 515. The Court noted that the plaintiffs' action was "appropriate" because they were no longer members of the plan in question and therefore could not sue for benefits due to them under the plan, under ERISA's Section 502(a)(1)(B). Thus, the Court found the plaintiffs could rely on the catch-all remedial provision, or else be left without a remedy in contravention of the language and purposes of ERISA and trust law. *Id.*

The Sixth Circuit, interpreting *Varity Corp.,* has found that the catch-all provision of ERISA does not allow an action against a fiduciary for breach of fiduciary duty when the plaintiff is merely suing for run-of-the-mill denial of benefits. *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 615 (6th Cir. 1998). The Sixth Circuit noted: "The Supreme Court clearly limited the applicability of [ERISA's catch-all provision] to beneficiaries who may not avail themselves of § 1132's other remedies." *Id.; cf. Powell v. Chesapeake and Potomac Telephone Co. of Virginia,* 780 F.2d 419, 424 (4th Cir. 1985) (finding catch-all provision of ERISA does not allow for recovery of extracontractual or punitive damages against a plan fiduciary).

Here, it is clear that Peterson has a sufficient remedy under ERISA–his action for benefits due to him under the Plan. He can be made "whole" by this action. Thus, since ERISA provides an adequate remedy for Peterson against the Plan, Peterson may not also invoke ERISA's catch-all provision to maintain an action against Wausau as a fiduciary. Accordingly, summary judgment in Wausau's favor will be granted, and Wausau is dismissed from this action.

21

## B. The Benefits Determination

Peterson contends, *inter alia*, that Wausau's and the Plan Administrator's determination that he is not eligible for "any occupation" disability benefits was an abuse of discretion because it was not supported by substantial evidence. Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion" and "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)), *overruled by implication on other grounds by Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003). Wausau's and the Plan Administrator's determination is supported by conclusions from three independent file reviewers: Drs. Center, Mosbach, and Axelrod. Peterson takes issue with specific findings of each reviewer, noting in particular that Dr. Center's and Dr. Mosbach's reports are specifically rebutted by Peterson's treating physician and his examining neuropsychologist. Peterson further argues at length that the greater—indeed, he contends, overwhelming—weight of the evidence before the administrator supported a finding of total disability from any occupation. In so doing, Peterson essentially posits that the three independent file reviewer's opinions *cannot* amount to "substantial evidence" in light of the strident and well-developed opinions in favor of disability by Peterson's long-term treating physicians and medical professionals.

But the court is mindful that "standards of review do matter," and deference under the abuse of discretion standard "has particular significance in the context of ERISA." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 326 (4th Cir. 2008). As the Fourth Circuit has explained:

> At its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance. The "deference that is the hallmark of abuse-of-discretion review," is deference enough to appreciate reasonable disagreement.

22

*Id.* at 322. Thus, the Fourth Circuit continued, the abuse of discretion standard in the ERISA context compels "a healthy measure of judicial restraint." *Id.* at 323.

Arguably, perhaps, the *most reasonable* evaluation of Peterson's claim would afford significantly greater weight to the opinions of Peterson's long-time treating psychiatrist, Dr. Buongiorno, and the examining neuropsychologist, Dr. Jones, than to the opinions of three medical professionals who merely reviewed Peterson's file. However, it is not the court's role here to re-weigh the evidence in the first instance. Although the report from Dr. Center does appear a bit cursory, and also incomplete in light of case development after her April 2004 report, the denial of benefits decision is also supported by the reports of Drs. Mosbach and Axelrod. Dr. Mosbach's report, while it reaches opposite conclusions than Dr. Jones did from the same set of neuropsychological test results, is nonetheless reasoned and credible. Dr. Axelrod's report, too, bears the mark of a thorough review of Peterson's file, including not insignificant phone consultation with Drs. Buongiorno and Jones regarding their opinions and Peterson's treatment. After his thorough review, Dr. Axelrod came to a reasoned, supported opinion that Peterson retained cognitive ability and could return to some form of less-stressful work. Dr. Axelrod opined Peterson is partially impaired by his depression, but not totally disabled from any occupation within the Plan definitions.

Certainly, in order to rely on the file reviewers' opinions, Wausau and the Plan Administrator chose to discount the evidence in favor of Peterson's eligibility, including treating physicians and the Social Security determination that Peterson met its definition of totally disabled. However, the court cannot say that this process was so unreasonable and unprincipled that it must be overturned for abuse of discretion. Rather, the court finds there is room here for reasonable disagreement over whether Peterson met the Plan's definitions of totally disabled from any occupation. There is no rule under ERISA that requires a treating physician's opinion to be given greater weight than any other professional opinions. Although

23

plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 824 (2003), the Supreme Court has explained:

> But, we hold, courts have no warrant to require administrators automatically to accord special weightto the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Id.* Certainly, the opinions of Dr. Mosbach, and particularly Dr. Axelrod, fall into the category of "reliable evidence." Thus, the Plan Administrator and Wausau could reasonably rely on these opinions and thus give less weight to the opinions of Peterson's treating and examining physicians and the Social Security ALJ in concluding Peterson was not eligible for further benefits. Certainly, if the court or another decisionmaker were making the determination in the first instance, it might find Peterson eligible for "any occupation" benefits based on the strength of Dr. Buongiorno's and Dr. Jones' opinions and the Social Security determination. However, as noted above, the opinions of Dr. Mosbach and certainly Dr. Axelrod were reliable. This court must be mindful that it may not reverse simply because its decision would be different from the plan administrator's. Rather, according the Plan Administrator the deference required under the abuse of discretion standard, this court must find on these facts that the decision to deny Peterson "any occupation" disability benefits was a reasonable one.

The only potential factor in the abuse of discretion analysis that gives the court pause is that the court is concerned that Wausau was operating under a conflict of interest. Although not a conflict of interest in a traditional sense in the ERISA context,[4] the court is interested in the role Wausau had in simultaneously pursuing a Social Security disability claim–via an

---

[4] As the Supreme Court clarified in *Glenn*, the dual role of paying out claims and determining if claimants were eligible for benefits creates a conflict of interest that must be weighed as one factor in the abuse of discretion analysis. This type of conflict is one often recognized in ERISA cases.

independent contractor–and choosing a file reviewer to determine if Peterson was eligible for "any occupation" disability benefits. As Peterson explains in detail in his reply brief in support of summary judgment [DE-91], it appears Wausau had a motive to deny Peterson's claim after some period of receipt of Plan benefits if Peterson had a successful Social Security claim. The motive involves money: Wausau could then recover overpayments from Peterson resulting from retroactive Social Security benefits, and it could keep twenty-five percent of any such "subrogation" recovery. Defendants rather tersely deny Wausau had such financial motive in the Affidavit of James Renfrow, IP's manager of benefit programs. [DE-88-2]. Renfrow attests:

> 7. Wausau Benefits did not receive more compensation if a claim for long term disability benefits was denied. [Wausau was paid a monthly per capita fee.]

> 8. Pursuant to the Administrative Services Agreement . . ., Wausau also was to provide certain subrogation services as described in Sections 6.1 through 6.5 of the Agreement. Subrogation services are *separate and distinct* from the services Wausau Benefits provided in assisting the LTD Plan in the evaluation and administration of claims for long term disability benefits.

> 9. The subrogation provision of the Administrative Services Agreement does not apply to the issue of the overpayment Mr. Peterson received based on the receipt of social security payments. When those benefits are recovered, Wausau Benefits will not be entitled to receive and will not receive any portion of that overpayment.

Renfrow Aff. ¶¶ 7-9 (emphasis added and citation omitted) [DE-88-2]. The court is not persuaded by Mr. Renfrow's statements.

Rather, the court will look directly to the controlling contractual provisions between Wausau and IP (referenced by Mr. Renfrow), which state in part:

Section 6: Subrogation Services

6.1    WAUSAU agrees to provide [IP] with certain clerical services with respect to the Plan's subrogation provisions. Such clerical services shall include, but not be limited to:
   a. Contacting the claimant to determine the applicability of the subrogation provisions;
   b. Notifying the claimant . . . of the Plan's subrogation provisions;
   c. Reserving any rights the Plan may have to recovery under the subrogation provisions;

      d.   Requesting repayment under the Plan's subrogation provision.

   . . .

6.3    If WAUSAU is unsuccessful in its initial collection attempts under Section 6.1, it shall refer the matter to [IP] and shall make further collection attempts at [IP's] request.

   . . .

6.5    Any amount collected by WAUSAU under the Plan's subrogation provision shall be promptly repaid to [IP's account] and shall not reduce the service fee provided for in this Agreement.

D 6-7, Ex. Pages 87-88. Although Section 6.5 says any subrogation recoveries are to be repaid to IP, the "Fee Structure" Exhibit to the Administrative Services Agreement clearly states as a line item fee "Subrogation Servicing Internal Administration," "25% of Recoveries." D 54, Ex. Page 135. Thus, the contract reveals that Wausau was, indeed, entitled to a significant portion of any subrogation recoveries. In fact, it is a commission, as Peterson refers to it. The court finds it immaterial in determining the *existence* of a conflict of interest that Wausau's subrogation services are "separate and distinct" from the claims handling; either way, Wausau gets the financial benefit.

      Certainly, the actions taken by Wausau to recover the "overpayment" to Peterson due to the retroactive Social Security benefits exactly match the "subrogation services" detailed in Wausau's contract. Wausau sent Peterson four letters (consisting of three demands and one revised demand) informing him of the Plan's provisions for overpayment due to Social Security benefits and demanding repayment. The three demands from Wausau seem to comprise Wausau's "initial collection attempts" under Section 6.3. Presumably, then, Wausau's subrogation attempts were complete–with no commission earned–and any collection responsibility shifted back to IP. Perhaps this explains why Mr. Renfrow could state in his affidavit that Wausau would not be entitled to any portion of any eventual recovery from Mr. Peterson.

      The financial benefit to Wausau from overpayment recoveries requires further probing to fully understand how it creates a conflict. If Mr. Peterson, for example, had been awarded

26

retroactive Social Security benefits but had been found eligible for continued Plan benefits under the "any occupation" standard, the "overpayment" amount would have been deducted from his future stream of monthly Plan benefits until they were repaid. *See* Plan 21, Ex. Page 58. Since Wausau does not fund the Plan payments, Wausau would get no benefit from that scenario. *Only if* Mr. Peterson had *both* been awarded retroactive Social Security benefits *and* been denied future Plan benefits, could Wausau have an opportunity to earn a subrogation commission. The conflict is thus elucidated: Wausau had a financial motive to deny Peterson's claim after some time (such as when it was reviewed under the "any occupation" phase) in the knowledge or assumption that Shaw had developed a successful Social Security claim, and then pursue the resulting "overypayment" and its twenty-five percent commission. That commission here would have been $13,795.97, had Peterson paid the amount Wausau demanded.

The court then, must determine what to make of this conflict of interest. Peterson argues that Wausau, IP, and the Plan should be judicially estopped from relying on its independent reviewers opinions' against disability. The Fourth Circuit has stated judicial estoppel has three elements:

> 1. The party to be estopped is asserting a position that is factually incompatible with a position taken in a prior judicial or administrative proceeding;
> 2. The prior inconsistent position must have been accepted by the tribunal; and;
> 3. The party to be estopped must have taken inconsistent positions intentionally for the purpose of gaining unfair advantage.

*King v. Herbert J. Thomas Mem. Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998). Peterson posits that Wausau, who assisted Shaw in making the Social Security claim, and the Plan, who ultimately funded Shaw's efforts, should be found to have "asserted" the position in Peterson's Social Security proceeding that Peterson was totally disabled from any work. However, only Shaw's representative at the hearing and Peterson himself actually took that position. Thus, the first element of judicial estoppel fails, and this doctrine is inapplicable here. Moreover, the court cannot find any authority to support Peterson's position that Wausau's particular conflict of

27

interest or sequence of actions should be given special consideration on a claim for benefits under ERISA. Even the case upon which Peterson relies to assert his estoppel argument, *Ladd v. ITT Corp.,* 148 F.3d 753 (7th Cir. 1998), acknowledged that judicial estoppel was "technically not applicable" because the plan administrator and employer were not parties to the Social Security proceeding. *Id.* at 756. The *Ladd* court merely found this sequence of facts to "cast additional doubt" on the claims determination. *Id.*

Here the court finds that the sequence of facts outlined above indicate Wausau operated under a conflict of interest. A conflict of interest, under *Glenn*, is one of many factors to weigh in determining if there was an abuse of discretion. But, upon closer examination, the court concludes this will not be a significant factor indicating an abuse of discretion. There are no particular circumstances, such as a history of biased claims administration, that indicate Wausau's conflict of interest affected the benefits decision. At the most, Dr. Center's rather shallow, perhaps weakly supported opinion against disability, may indicate Wausau's choice of reviewer was affected by its conflict of interest. However, the court finds this conflict of interest was corrected for or ultimately washed out by Wausau's decisions to choose two more file reviewers who gave opinions that were more substantial than Dr. Center's report, and indeed, that seem reasoned and reliable. Indeed, the CV from Dr. Axelrod, the final reviewer chosen by Wausau, seems to indicate that he is a distinguished leader in his field of psychology. Additionally, Wausau has taken the step of separating its subrogation services from its claims handling, thus reducing the chance of potential bias from the conflict of interest. Thus, the court finds the conflict of interest factor does not weigh heavily in the direction of finding an abuse of discretion. As such, this consideration, duly made, does not alter the court's conclusion above that the denial of "any occupation" disability benefits to Peterson was reasonable under the abuse of discretion standard of review.

28

## C. **The Counterclaim for Overpayment of Benefits**

It seems clear from the Plan language, quoted herein, that Peterson is required to repay the Plan Administrator the amounts he was "overpaid" due to delayed Social Security payments covering the period in which he received Plan benefits. *See, e.g.,* Plan 11, Ex. Page 48 ("If disability payments from other sources are delayed and paid to the Covered Employee retroactively in a lump-sum amount, the Covered Employee will be required to reimburse the Plan for the amount of any excess long-term disability benefits . . . ."). Less clear is whether "other sources" of disability income that must be repaid also includes Social Security children's benefits awarded retroactively for the couple's four minor children. These dependents' benefits were made payable to Sheryl Peterson, Peterson's wife, presumably because she was the one who made the application. For the reasons stated below, the court concludes these dependents' benefits are also included in the amount that Peterson must repay.

Peterson makes several arguments against *any* repayment and alternatively, against the portion of the repayment resulting from the dependents' benefits. First, Peterson posits that assignment of future Social Security benefits is not permitted by law (Social Security statute)[5], and, thus, repayment here is not permitted. However, the court disagrees with Peterson's characterization of the repayment. As the Plan states, the amount to repaid is occasioned by an offset in Plan benefits due to delayed payment from other disability sources. If Peterson had been receiving these monthly Social Security benefits as they were due to him, in 2002 through 2004, then at the same time he would have received *less* monthly benefits under the Plan to account for the offset. Peterson makes no argument against contemporaneous offset of Plan benefits by his own Social Security benefits; the Plan language is clear on this point. But

---

[5] 42 U.S.C. § 407(a) states: "The right of any person to future payment under this title shall not be transferable or assignable, at law or equity, and none of the moneys paid or payable or rights existing under this title shall be subject to execution, levy, attachment, garnishment, or other legal process . . . ."

Peterson's Social Security claim took some time after an initial denial to be resolved. The repayment is simply reimbursing the Plan Administrator money that the Plan Administrator had overpaid Peterson. Because Peterson *chose* monthly Plan benefits *without a reduction for estimated Social Security benefits*, IP 469, Ex. Page 202, the overpayment had to be corrected after the retroactive Social Security award was made. The Plan, therefore, does not require an assignment of future Social Security benefits. It simply requires the claimant to correct the overpayment made by the Plan once it becomes clear that an overpayment was made. Peterson could have avoided the need to repay by choosing monthly Plan benefits that were reduced by estimated Social Security benefits. Certainly, the incentive for any claimant is to choose more monthly benefits at the time; however, this choice is not without consequences when, as here, a retroactive Social Security award is made. Peterson cannot avoid the Plan terms—requiring offset of Plan benefits by other disability payments—by invoking an inapplicable Social Security statute.

Peterson also argues that the repayment is barred under ERISA. At issue again is the catch-all provision of ERISA, Section 502(a)(3), which states:

> A civil action may be brought by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain *other appropriate equitable relief* (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan.

29 U.S.C. § 1132(a)(3) (emphasis added). There is no dispute that this provision is the one under which the Defendants are bringing their counterclaim for recovery of overpayments. Peterson argues, however, that the remedy the Defendants seek is not recoverable under this section because it is *legal*, as opposed to *equitable* relief. Peterson contends the Defendants are seeking money damages against him—a legal remedy—rather than any particular fund in Peterson's possession, which would constitute an equitable remedy.

30

The court again disagrees with Peterson's characterization of the dispute. The Supreme Court considered what constituted "other appropriate equitable relief" under Section 502(a)(3) of ERISA in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), and *Sereboff v. Mid Atlantic Medical Servs., Inc.*, 547 U.S. 356 (2006). In both cases, the Supreme Court noted that restitution in equity could be had against specific, identifiable money or property in the opposing party's possession. *Knudson*, 534 U.S. at 213; *Sereboff*, 547 U.S. at 363. The court finds that the nature of recovery sought here must be classified as equitable. The Plan seeks recovery of a specifically-identifiable fund in Peterson's possession—overpayments made directly to Peterson. Thus, the court concludes that the recovery of overpayments is permissible under ERISA Section 502(a)(3). *See Bowling v. PBG Long-Term Disability Plan*, 584 F. Supp. 2d 797, 811-813 (D. Md. 2008) (concluding same and citing cases).[6]

Finally, the court must address whether the retroactive dependents' benefits should also be factored into the overpayment amount. Peterson points out that the Plan language provides for repayment only if "disability payments from other sources are delayed and paid to the *Covered Employee* retroactively." Plan 11, Ex. Page 48 (emphasis added). Two points must be addressed: (1) whether these dependents' benefits constitute "disability payments from other sources" under the Plan; and (2) whether they may be considered as being paid to the Peterson. On the first point, the court notes the children could only receive these benefits because their father, Peterson, received Social Security disability payments. *See* 20 C.F.R. § 404.350. Presumably these children's benefits are to help cover family expenses of a disabled claimant. The court concludes, then, that these dependents' benefits under Social Security should be

---

[6] The court also rejects Peterson's argument that Defendants are barred by the doctrine of unclean hands from recovering the overpayments. The sequence of facts Peterson posits constitute unclean hands—apparent duality in relying on Dr. Center's opinion against disability while Shaw made a case for Social Security benefits—have already been duly considered as a factor in the abuse of discretion analysis. Moreover, the court does not find these circumstances constitute unclean hands so as to bar the Defendants' counterclaim.

considered "disability payments from other sources" under the Plan. This is certainly the established interpretation given to the Plan by the Plan Administrator. But these dependents' benefits were actually made payable to Peterson's wife, Sheryl, because she is the one who applied for dependents' benefits after her husband's Social Security determination. The record indicates the Petersons are an intact, nuclear family. Surely, these benefits were not somehow segregated away from Daniel Peterson. There is no record evidence indicating anything other than these dependents' benefits were treated as any other family income. More importantly, there seems to be no reason why Daniel Peterson could not have made the application himself, in his name, in which case the dependents' benefits would have been made payable to him. The court is thus hesitant to distinguish these dependents' benefits from those that are otherwise subject to repayment under the Plan simply because, on what appears to be a mere technicality, the retroactive award check was made out to Peterson's wife.

Significantly, the court notes that Peterson was made aware of the Plan Administrator's interpretation that Social Security *dependents'* benefits would offset Plan benefits. The "Long-Term Disability Payment Options" form signed by Peterson stated that Plan benefits would be reduced by Social Security benefits "which you *or your spouse and family* are eligible to receive." IP 469, Ex. Page 202 (emphasis added). Peterson agreed to repay overpayments resulting from any retroactive lump-sum Social Security payment. The Plan Administrator calculated these overpayments based on both individual and dependents' benefits, as the form signed by Peterson stated, and Peterson agreed to repay these overpayments. Peterson should be bound by his agreement.

In conclusion, the court will allow the Defendants' counterclaim for recovery of overpayments. However, the record is not entirely clear on the exact amount of overpayments. The amount Defendants' seek on their counterclaim–$55,183.87– relies on the overpayment calculations made by Wausau when it demanded repayment. *See* IP 284-85, Ex. Page 316-17.

Peterson correctly points out one problem is that his monthly benefits were only sixty percent of his salary, not the sixty-six and two-thirds percent that should have been paid under the Plan because he had dependents. But it seems Wausau corrected for this by calculating first what Peterson *should* have been paid monthly–the higher benefit amount less the Social Security payments–resulting in $1,227.26, after estimated FICA taxes, that he should have been paid monthly. Then Wausau figured what Peterson had *actually* been paid monthly after FICA taxes–$3,272.01– and subtracted from that figure the amount he *should* have been paid monthly. The resulting figure, with taxes factored in, should be the monthly amount of overpayment, which Wausau calculated as $2,044.75. Assuming those amounts of actual Plan and Social Security benefits payments and taxes used in those calculations are correct, this monthly overpayment amount should be accurate.

But the court is unclear on how Wausau figured the total overpayment amount. It would seem correct to multiply the monthly overpayment of $2044.75 by twenty-five,[7] or the number of months in which Peterson was paid both by the Plan and by Social Security disability benefits, resulting in $51,118.75 in overpayments. However, Wausau arrived at a higher figure–$55,183.87–by, it appears, disregarding taxes (actual and estimated) from this final calculation. *See* IP 284, Ex. Page 316. The court finds this figure to be unfair to Peterson and inaccurate.

To ensure the fair and accurate calculation of overpayments, the court will allow the parties to confer on the amount due and report back to the court by the date specified herein before judgment will be issued on the Defendants' counterclaim. Any overpayment sought by the Defendants should be based on *actual* amounts paid to Peterson and his family by both the

_____

[7] See the factual section for a detailed discussion of the periods for which Peterson was paid by the Plan and retroactively paid by Social Security. The facts seem to indicate it was a twenty-five month period, from May 1, 2002 to May 31, 2004, in which the Plan payments and Social Security retroactive benefits overlapped.

33

Plan and Social Security on overlapping time periods. Of course, in light of the court's decision in favor of Defendants, the Defendants may choose not to pursue recovery of the overpayment.

## IV. CONCLUSION

For the reasons discussed herein, the court hereby DENIES the motions for summary judgment by Plaintiff Daniel Peterson [DE-71, 73] and ALLOWS the motion for summary judgment by Defendants [DE-74]. Wausau Benefits, Inc., is hereby DISMISSED from this action, and Peterson's claims for benefits under the International Paper Company's Long-Term Disability Plan are hereby DISMISSED. The court hereby ALLOWS Defendants' counterclaim [DE-9] for recovery of overpayment amounts. The parties are DIRECTED to confer on the amount due under the counterclaim in accordance with the court's reasoning herein, and Defendants are DIRECTED to report to the court on or before **November 17, 2009**, on the overpayment amount. The Clerk is further directed to refrain from issuing judgment on the Defendants' counterclaim until the court directs entry of judgment.

SO ORDERED.

This the 30th day of October, 2009.

JAMES C. FOX
Senior United States District Judge

34